May it be support. Good morning. My name is Michael Burke and I represent Mr. Lane in this appeal. I will track of my time and I will attempt to reserve three minutes for rebuttal. Mr. Koza, that's just so you know, Michael Burke was a clerk of mine 25 years ago. Has it been that long? I think it's longer than that, your honor. Go ahead with your argument. Thank you. As a housekeeping matter, I will be referring to the two sisters in this case as we did in the briefing as EB and JB. And with the court's permission, I would like to address this morning the first two arguments from Mr. Lane's brief. Briefly discussing issue one and then made by both EB and JB to two medical providers. These statements were admitted at trial pursuant to the hearsay exception for statements made for medical diagnosis and treatment. The second issue concerns Mr. Lane's challenge to the admission of the expert testimony of the forensic interviewer Amy Heil. That objection was based on Daubert and Kumho tires. Regarding issue one, I acknowledge that this court's case law makes it very difficult for a criminal defendant in a child sexual abuse case to challenge the admission of a child statement to a medical provider in a normal course. This court's decision in Kutuatua makes it clear that if the statement was made in a medical setting to a medical provider, absent evidence to the contrary, the sufficient foundation has been established to admit the hearsay statements. This case presents a somewhat different situation. This court's case law is also clear that when a district court bases an evidentiary ruling on a clear misunderstanding of the facts, it abuses its discretion. And in this case, the court in admitting the hearsay statements from these two girls stated that they had both testified that they wanted the abuse to stop. Now this was a factual error on the district court's part. And as we said at the briefing, it's not an unreasonable assumption in a case in which a child is being abused. That's not the issue here. The question is, did they testify to that fact? And they did not. So this court is placed in a situation where you have an abusive discretion by the district court in admitting these hearsay statements. The testimony from these witnesses was compelling. And the two witnesses, let me clarify, were a nurse practitioner from the urgent care center named Jacqueline Kigundu and a forensic nurse practitioner named Suzette Clinton with the safe child center in Flagstaff, Arizona. Both of these professionals provided compelling testimony. They were experts, and the jury was instructed that they were experts. And they provided hearsay statements, both of them from the victims. In this case, there is evidence to support a finding that these statements were not made for the purposes of medical diagnosis and treatment. And I'd like to focus specifically on the testimony from Suzanne Clinton, the forensic nurse practitioner. First, with regard to EB, the record reflects that of the two sisters, she was the less verbal, although she was the older sister. And her testimony at trial in its entirety about these exams, both exams, was that she had been examined by a doctor. And that was in response to direct And her testimony with regard to going to see Suzanne Clinton was that she didn't know. She said, you would have to ask my mother. I think it was because they wanted to check into my DNA. And then she added, or they might have been trying to find Wyatt and Joey. And just to clarify from the record, there were approximately 10 residents at the house where the girls lived with Mr. Lane. One of those occupants was a woman named Char Lane, who was the half sister of Mr. Lane. And as we indicated in the brief, there was animosity between the two. And she and her boyfriend, Wyatt, were the ones who first spoke with the girls about the alleged abuse. So not to spend too much time on this issue, but our argument is that there was an abuse of discretion. And even under the liberal standard that the court has established for the admission of 8034 statements of these types of cases, we submit that it was an error. What about the objective circumstances of the interaction? I mean, they didn't go to a police station. They went to a medical facility that they had both been to before for medical checkups and other procedures. They had their vital signs taken, a lot of things that you would do in the course of a medical exam ordinarily. Doesn't that support the conclusion that they would have understood that what they were there for was a medical process? Yes, Judge Miller, it does support it. But I would say that in this case, it is not definitive, especially with regard to Suzanne Clinton. Those little girls that day had already been seen by Nurse Kidundu, and then were taken to see another nurse that same evening. In fact, the exams for those two girls took place around midnight on that evening. And so I would say with regard to Nurse Kidundu, you're right, Judge Miller, that under the Kutsuwatawa standard, yes, the objective indicia would support it. I would disagree with regards to Ms. Clinton. And that error alone, she was a significant witness. She was the government's second to last witness. And so I think that goes to the question of error. With regard to the last witness, which is Amy Heil, who is a forensic interviewer. He argued multiple things, arguing that the testimony was inadmissible because it was irrelevant, because it was prejudicial, because it was unreliable, and that it violated Rule 403. The district court, pre-trial, ruled that it was going to admit Ms. Heil's testimony, because she had the expertise to do so, to testify. Judge made no finding whatsoever about the reliability of her testimony. And in truth, the testimony itself was both extremely confusing, but also very damaging. Confusing in the sense that Ms. Heil admitted, and the government admits, that as a forensic interviewer, she is unable to tell the truth. She testified, however, to the jurors as the final witness. And I would suggest that she was essentially the cleanup witness here, because she testified about aspects of children who allege abuse, although she had difficulty narrowing her testimony to children who allege abuse. But she testified about at least three factors that were critical in this case. One was recantation. The record indicates that EB recanted her allegations to an aunt. There was testimony from that aunt. Ms. Heil said that some of the more common reasons for recantation are lack of material support or just family pressures, the question of false allegations. Ms. Heil testified at ER 501. Overall, they're fairly rare. And about coaching by another adult, which was another issue in this case, she said typically the child who was coached lacks detail in their recounting of the events. Those were all critical issues in this case. And Ms. Heil, who was not properly qualified to testify because of the unreliability of her testimony, explained these things to the jurors at the close of the government's case. So based on the district court's failure to fulfill its gatekeeping role under Daubert and Kumhotair, we would submit that this alone constitutes reversible error in this case. Now, we are aware that this court recently held that remand for a new trial is not necessarily required, but we would submit that because this government opposed a Daubert hearing in this case, and there was no Daubert hearing, there is simply nothing in the record from which this court can determine whether Ms. Heil's testimony was reliable. And although the court could remand for a post hoc Daubert hearing, we submit that that is inappropriate in a case like this, where the jury has already heard the testimony and the district court has, understandably, some incentive, given questions of judicial economy, to justify the decision to admit the testimony. Could I just ask you to clarify specifically what it is that you think is objectionable about this testimony? I mean, she doesn't tell the jury because she can't tell the jury these witnesses are truthful or these witnesses are not truthful. But just as a general matter, do you think that it could be okay to have an expert who tells the jury, you know, this is the way that children remember events, this is the way that children talk about events, it might be different from the way that adults do. Could you have an expert who presents that to the jury to help them understand how to evaluate trial testimony? Only if that expert were able to establish the reliability of her testimony, that there was some reliability for the determination that this is how children who are actually abused react. But by telling the jury that children who may be truthful or may not be truthful all react this way, and in all candor, your honor, this testimony usually appears to vouch for the witness that any type of characteristics you might see would explain that the person had been abused. Counsel? Yes, your honor. Counsel, I take it you didn't try this case? No, your honor, two of my colleagues at the Federal Public Defender's Office. Did the trial defense counsel ask Judge Snow to make a reliability finding for Heil? Yes, your honor. It was in the briefing, which can be found at ER 1271-1279, and it was discussed at a pre-trial, the final pre-trial conference, and that is where the district court stated that it was going to allow it and did not conduct any type of inquiry into the reliability, but merely relied, using this court's decision in big head, to say that if she had expertise, she could testify. With the court's permission, I will reserve the rest of my time if there are no other questions. Thank you, counsel. We'll hear from the government. May it please the court. My name is Peter Kozinets. I represent the United States. After subjecting his young stepchildren to several years of devastating sexual abuse, the defendant was convicted on seven counts of aggravated sexual abuse of children under the age of 12. Those convictions should be affirmed. And going first to the hearsay issue that defense counsel has raised, the Lukashoff case teaches that the district court's finding that statements were made for the assessment of live testimony, that's a highly deferential standard and must be affirmed if the district court's conclusion is plausible in light of the record as a whole. The Kutz-Watiwa case then recognizes that these kinds of examinations can serve more than one purpose, as long as, and this is at page 1132 of Kutz-Watiwa, as long as one of the purposes, quote unquote, of the sexual assault nurse examination is to diagnose and treat any physical, psychological, or emotional problems that the victim has and to render appropriate treatment that qualifies the victim's medical history under the medical treatment exception to the hearsay rule. With those two principles in mind, we can then look at the record and see it contains overwhelming evidence to support the district court's factual conclusion about the purpose of these statements. First, counsel, turning to the issue of the forensic interviewer, Amy Heil, what's your best, first of all, do you concede that the district court did not make a finding of reliability? That's clear. No, your honor. No, no, your honor. Let me explain why. The district court had detailed briefing at the motion and lemonade stage that directly addressed the applicability of Kumho-Tyre, Daubert, and Rule 702 and subsequent Ninth Circuit case law, including Freeman, which recognized that an experience-based expert provides reliable testimony when the scope of their opinions falls reasonably within their education, training, and experience. Now, at the oral argument on the motion, and this is at pages roughly 1195 to 1198 of the excerpts of record, defense counsel acknowledged that this kind of testimony has been repeatedly approved of by this court, and the district court made clear that it would provisionally allow that testimony subject to the government, and this is the important part, subject to the government laying sufficient foundation to show that the expert's testimony was grounded in her direct professional experience interviewing people who claim to have been victims of child abuse. And it was that requirement, which echoes the reliability requirement that has been set forth in this court's experience-based expert testimony case law, a case law coming after Kumho-Tyre, like Jarawa and Ruvel, Caldwell-Garcia and the Freeman case. Did any of those cases involve a situation where the trial court was asked specifically to make a reliability finding and the court did not? Standing here right now, I cannot tell you if that was part of the fact pattern in those cases, but those cases did present the issue of whether the expert testimony should be admitted, and in those, in Jarawa and Ruvel Caldwell-Garcia, the district court did not make an express reliability finding, but the record contained sufficient indicia of reliability, to allow this court to nevertheless affirm, to find the error harmless. I give you that some of our case law says that if it's in the record, that the trial court, or indeed a reviewing court, can look to what's in the record. But opposing counsel argues, and I find nothing to the contrary in the record, that this was a case where the district court was specifically asked to make a reliability finding and the court did not. Well, so, your honor, what the district court did was, in substance, determine, lay out the criteria for reliability and say, if the district court, if the government can lay that foundation, then the evidence is proper. And that's exactly what happened at trial. The government laid an extensive foundation for Ms. Heil's testimony, and then when the defense continued to object, the trial court stepped in and affirmatively constructed his own special instruction to the jury, to make clear that the bounds of Ms. Heil's testimony would remain comfortably within her education, background, and experience. So she was only to testify about general patterns of behavior observed among people disclosing alleged childhood sexual abuse. She wasn't to go beyond that, and she certainly wasn't to testify about whether any specific victim was telling the truth or not. So the court exercised its gatekeeping role by wrestling with these issues pre-trial, requiring a certain foundation to be laid, and stepping in and further regulating the admission of this testimony with this special jury instruction. Now, the court may not have used any sort of magic words, but I submit that these experience-based cases like Ruvalcabal Garcia and Freeman and Jarawa do not necessarily require the court to say anything specific. What is most important is that the record give assurance that the court was aware of these requirements, wrestled with them, and actively policed and regulated the admission of this testimony. But even if you're... I'm sorry, go ahead, Your Honor. Oh, I was just going to ask, was there anything to prevent the government from asking Judge Snow to make a reliability finding? No, and the government did just that, and that is in the government's response to the motion in limit A. That's at ER 1243 to 1268, where the government briefs this in detail and attaches the expert's CV and a compendium of research citations that support all of the opinion testimony that the expert was prepared to provide. And then when the district court made its ruling at the final pre-trial conference, that was, we submit, tantamount to a sufficient reliability analysis. So you're arguing that the district court can make a reliability finding by implication? That doesn't seem to conform with the case law. Your Honor, I think this goes beyond implication, though, because the district court used the very reliability criteria that this court has laid out in its experience-based case law. So- How do you distinguish- Reference the funding criteria. Excuse me, I'm sorry to interrupt, but how do you distinguish, for example, Valencia-Lopez? Valencia-Lopez- It looks to me as though this is spot on with that case. It is, it's not, Your Honor. Valencia-Lopez was very different. In Valencia-Lopez, the district court did not wrestle with the reliability of the opinion testimony. Instead, it just said this is an issue that goes to the weight, not the admissibility, and didn't perform its gatekeeping role. Secondly- Let me just disagree with you for a second, so you can give your response, because what the district court said in Valencia-Lopez is, this is admissible if the government can establish the foundation, which is sort of what happened here. Well, okay, but the opinion that really drove the Valencia-Lopez decision was an extreme absolutist opinion about the ultimate issue in the case, whether there was duress. And the government agent testified that the likelihood of a cartel entrusting a large quantity of drugs to a coerced courier to get them across the border was absolutely nil, absolutely none. The opinion in Valencia-Lopez focuses on that language no less than seven times, and it was that opinion that drove the analysis. That opinion was never before disclosed in the case, so the trial court never even had an opportunity to even address the reliability of that testimony. And I think the key language in Valencia-Lopez is at page 900, where the court says it would be one hand for the expert to testify as a general matter about the risks facing the cartel when they use a coerced driver, but it was a far cry from that for the expert to say the cartel essentially never does that. There was too great of a gap between the expert's experience expertise and that extreme ultimate opinion. In this case, Your Honor, the district court made sure that Amy Heil's expert testimony remained well within the bounds of her experience-based expertise. And all of these things really make Valencia-Lopez an outlier and not applicable to this case. In any event, Your Honor, should the court find that there was any error, the error was harmless for the two independent reasons we've laid out in our answering brief. The record abundantly shows that Amy Heil had essentially the same kind of expertise that this court has recognized in other experience-based cases that allowed her to opine on these general characteristics that she addressed. The general thrust of her testimony has been well accepted by this court for the last 30 years in an unbroken line of published and unpublished cases. Moreover, the compendium of research materials cited in Exhibit 2 to the government's motion in limine showed that her opinions are widely accepted within the relevant field. That was never challenged by the defense. How is all that relevant to the question of harmlessness? If there's error in admitting the testimony, did it affect her? Not whether or not it was permissible in the first instance. Well, Your Honor, there are two types of harmlessness that operate independently in this context. The first type is, is there enough in the record to affirm the district court? And that was the kind of harmlessness that this court used in the first instance. The second flavor of harmlessness, if you will, we also submit independently that there was more than enough evidence viewing the record as a whole to show that there was compelling evidence of guilt and that Ms. Heil's testimony did not materially affect the result. Her testimony was just a small fraction of 50 pages of a 1,000-page trial transcript, and she was subjected to extensive cross-examination, so further mitigating any we have the compelling testimony of the child victims themselves and the third victim who testified, plus the medical providers who testified and the defendant's own shifting statements about his involvement with the kids. So there is just overwhelming evidence of guilt, so under that second prong of harmlessness, any error was harmless as well. And the third, under the Bacon case, should this court get that far into the analysis and find the error not harmless, we submit the interest of justice would support just a limited remand to redetermine the question of invincibility. And why is that the case? This is a case in which the victims were 10 and 11 years old at the time of trial. Only two years have passed since then, they're still very young. Retrial would re-traumatize them, it would re-traumatize the adult victim who testified, and really we submit would be too extreme of a remedy for this kind of expert testimony that is so well accepted in the field and has been so repeatedly accepted by this court for the last 30 years. Moving on to the... Before you run out of time, could you just briefly address the question of the dual role testimony of Gundu and... They're qualified as experts, the district court gives an instruction about them being experts, and yet it seems like almost all of what they said was simply fact testimony about what they observed and what the victims said. So why was that? So I think the key issue there is whether the defendant has established plain error with respect to this issue, and I think the answer is clearly no. First, as this court recognized in Goodman v. Staples, when a treating physician testifies to treatment rendered, they're testifying as a percipient witness, and that's essentially what these witnesses did here. They testified about the medical histories they obtained in the course of providing treatment. But I don't think that doesn't... I think that hurts you, that doesn't help you. I mean, that makes the fact that the district court gave the instruction that you should consider them as experts even less justifiable, right? Well, I think, Your Honor, though, that kind of the issue is, should this additional instruction have been given? And there's really very little, I think, value added. The additional instruction, just like the instruction they did receive, tells them that opinion testimony should be judged like any other testimony, and the jurors are free to accept or reject as much or as little of it as they deem fit. So I don't think there was an error, but... I mean, can you address Vera? Because there we said it was plain error, right? Absolutely. So Vera, Torralba, Mendia, and those cases cited by the defense all involve law enforcement case agents being put on to serve a hybrid purpose, to testify to facts and to testify to opinions. And Vera says that the Ninth Circuit has repeatedly recognized a host of concerns that apply specifically when case agents undertake that kind of testimony. And because of all that case law about case agents, it's plain error not to have this sort of dual role instruction in those cases. But nothing in any of those cases talk about medical treaters who are testifying about the treatment that they rendered. So it could not have been plain error. The district court could not have, you know, intuited that somehow there was some large body of case law that required a dual purpose instruction for a medical treater. The most closely analogous precedents that we found, Goodman versus Staples, and then the DeVol case from the Tenth Circuit, really point in the other direction. So there was no plain error and there was no substantial prejudice because of all of the independent, strong, compelling evidence of guilt. And because of the protections in Torralba-Mendia, also applied here, there was really kind of a demarcation between the reasons why these nurses got medical history and then the actual medical history they received. That minimized potential perjury confusion. The witnesses were very careful about laying detailed foundation for what they did. And again, there was substantial independent evidence of guilt. I see that I'm running out of time. You're actually over time, but our questions are coming up. Very briefly, the government relies, with regard to the testimony of Ms. Heil, relies heavily when discussing harmless error on this court's decision in Rubel-Cava v. Garcia. Rubel-Cava is easily distinguishable. That is a case that involves the testimony of a fingerprint examiner. And there was considerable testimony at trial in the record for the appellate court to about the methods that were used by the fingerprint examiner to conduct his examination. That was why this court, on appeal, was able to find the error harmless. There was no finding of reliability in this case, and there was no testimony at all similar to what you had in Rubel-Cava. Also, the government, when talking about harmless error, we submit is looking at it from the wrong direction. Kodiakos makes it clear that the question is not whether there was enough evidence to convict the defendant without the error. The question is whether this court can say that the error that occurred had no effect on the jury's determination. And the errors that we have addressed here, the testimony of two very experts who testified at the end of the government's case, almost certainly had an impact on the jury's determination, especially Ms. Heil's testimony, who was able to essentially knock down defense arguments about inconsistencies or questions about the victim's testimony. We would ask that the court reverse Mr. Blaine's convictions and remand for him. She did. Just a quick note, counsel. She did testify about her training background degrees and that she had been accepted as an expert witness in 23 cases. Is that correct? Yes, Your Honor. And in instructing the jury about the weight to be given her testimony, didn't the district court say this witness, referring to Heil, is certified as an expert witness? Judge did say that. It did say that, Your Honor. Yes. Okay. Thank you. Thank you. Thank you both for your arguments this morning. They've been very helpful to the court. And the case just argued will be submitted for decision.
judges: Hawkins, Thomas, Miller